## GENTRY VS SINGLETON.

### Opinion delivered April 6, 1901.

1.  *Partnership—Agency—Existence of Which, a Question for the Jury.*
    *—Evidence.*

    Where two parties enter into an agreement whereby one con-
    tributes money and the other his experience, services and
    time in buying and selling cattle, on an equal division of the
    profits, this constitutes a partnership; and where one partner
    makes a subsequent arrangement with a third party by which
    he assists the former upon a division of the formers share of
    partnership profits, and the other original partner did not
    dissent, only stating that he knew but one partner, and that
    was the one under the original agreement, it was error, in a suit
    brought against defendant to recover the price of cattle sold
    to him by the third party mentioned, without authority, to
    reject evidence that this third party was a partner with the
    second of the original partners; but the question of whether
    he was an agent of the original partnership, or a subsequent
    partner of one of the original partners should have been sub-
    mitted to the jury, under proper instructions.

Appeal from the United States Court for the Northern District.

WILLIAM M SPRINGER, Judge.

Action by Thomas G. Singleton against William E. Gentry. Judgment for plaintiff. Defendant appeals. Reversed.

This is an action in the nature of the common-law action of trover to recover the value of 56 head of cattle which the plaintiff alleged the defendant wrongfully took and converted to his own use. The facts are as follows: The plaintiff, Thomas G. Singleton, appellee herein, and who resided at Fredonia, Kansas, and J. A. Skaggs, who resided at Shawnee, Oklahoma Territory, in the Spring of 1897, entered into a co-partnership whereby Singleton was to furnish the money, and Skaggs his skill and time, in the purchase and sale of cattle, and they were to divide the profits equally. Skaggs afterward made an arrangement with J. N. Henry by which Henry was to assist him in the cattle business, and Skaggs was to divide his half of the profits equally with Henry. Singleton afterwards learned from Henry of this arranegment, and made no other objection than that Skaggs was the only partner he knew in the business, and Henry replied that all he claimed was one-fourth of the profits. About the latter part of June, 1897, Skaggs and Henry went together in a buggy to a farmer and cattleman by the name of Charles Bruner, and bought the cattle in question; and Skaggs gave Bruner a check for $500, and agreed to let the cattle remain in Bruner's pasture until he saw that the check was good, and that he would pay the balance later on. On July 7th Skaggs gave Bruner another check for $1,052, being the balance on the purchase price of the cattle. The cattle were to remain in Bruner's pasture

for a few days, until they got ready to move them, and they were to pay Bruner pasturage. Some days afterwards Henry came to Bruner's pasture with a man named Magill, who was the agent and buyer for W. E. Gentry, the appellant; and, after examining the cattle, Magill bought them for Gentry, and paid for them, and drove them across the country to Checotah, from which place they were shipped to market by Gentry. Henry paid Bruner for the pasturage of the cattle for the time they had remained after he and Skaggs went there. Henry then returned to Shawnee, where he deposited the check which he had received for the cattle in the bank. He and Skaggs then got into a controversy over a settlement, and Skaggs telegraphed for Singleton, who came down from Kansas and got out a warrant for Henry, but by direction of Singleton it was not served on Henry. After Skaggs, Singleton, and Henry failed to settle, Skaggs and Singleton came to Checotah to see Gentry, who told them that he had already shipped the cattle to market, and asked them why they did not go on to Henry about it, if he had no right to sell them. Singleton replied that he did, but Henry "talked real sassy" to him. Gentry refused to pay Singleton for the cattle, and he brings this suit. On the trial of the case Gentry offered to prove that Skaggs and Henry were dealing in cattle generally about the time the cattle in controversy were bought, and that they were generally regarded as partners, in the neighborhood, in such business; but the trial court ruled that, unless Skaggs and Henry had authority from Singleton to sell the particular cattle in controversy, he was not bound by the sale, and no title passed. The defendant saved exceptions to this ruling of the court, and the same is assigned as error. At the close of the testimony the trial court, on motion of counsel for plaintiff, directed the jury to find the issues for the plaintiff, and assess the damages at the reasonable market value of the cattle at the time they

were sold by Henry to Gentry. Defendant duly excepted to this action of the court, and the same is assigned as error. The jury, under the direction of the court, returned a verdict for plaintiff, and assessed his damages at $1,550. Defendant filed his motion for new trial, which was overruled by the court; and the court entered judgment on the verdict, to which defendant excepted and prayed an appeal, and took time to file a bill of exceptions, and in due time brought this case before this court for review.

*N. B. Maxey* and *Benjamin Martin, Jr.*, (*James M. Shackelford*, of counsel), for appellant.

*W. T. Hutchings* and *P. C. West*, for appellee.

THOMAS, J., Under the facts in this case, the appellee and J. A. Skaggs were partners. Singleton was to do nothing but furnish the money, and Skaggs was to buy and sell, and divide the profit equally with Singleton. This constituted them partners. Mr. Bates, in his work on Partnership (volume 1. p. 48, § 35), says; "Where A. contributes services in collecting and buying hogs and cattle, and B. furnishes the capital, profits to be divided, nothing being said about losses, there is a community of profits, and therefore a partnership, and A. cannot sue B. at law for his share. B. advanced $20,000 to H., to invest in the purchase and sale of cotton goods; H. to attend to business, and, after repaying the money, divide the profits equally. Real estate was bought with part of the proceeds, and the title taken in H.'s name. There was held to be a partnership inter se, and a loss must fall upon both. So, where S. gave N. $300 to buy sheep, S. to have half the profits, and if there were losses he was to have no interest, this is a partnership inter se, not merely in the profits, but in the $300." In Dob vs Halsey, 8 Am. Dec. 293, it was held; "Where one

*Partnership.*
*Agency.*

furnishes the capital for an undertaking, and another puts in his services in consideration of a share of the profits, indefinitely, there is a partnership between them as regards the parties themselves, as well as third persons." See, also Miller vs Hughes, 10 Am. Dec. 719; Bromley vs Elliot, 75 Am. Dec. 182; Leggett vs Hyde, 58 N. Y. 272. The court, in the case of Miller vs Hughes, above cited, in passing upon the power of one partner to bind another by private agreement between themselves, uses the following language; "That was a matter that concerned themselves only, and could not affect a contract made with any other; for as partners have equal authority over their partnership affairs, it would be preposterous to suppose that either of them could by such instructions limit the power of the other to bind him. " In the same case a partnership is defined to be a voluntary contract between two or more persons for joining together their money, goods, or labor, upon an agreement that their gain or loss shall be divided proportionately; and whether each contributes money or labor, or both money and labor, or, as in the present case, one finds money and the other labor, still it is equally a partnership. The fact that there was no agreement between Singleton and Skaggs that Skaggs should be liable to sustain a proportion of the loss, if any should happen in the course of trade, constitutes them none the less partners. As Skaggs was entitled to a share of the profits, it follows as a legal consequence that he must share the loss. The rule in this respect is that one who shares in the advantages must also share in the disadvantages of the partnership concern. Miller vs Hughes, supra. Skaggs entered into an arrangement with Henry whereby he was to divide his half of the profits with him. This arrangement was known to Singleton. Skaggs was the active member of the copartnership. Few persons, if any, in the neighborhood, outside of the bank through which he and Singleton conducted their busi-

ness, knew Singleton in the business at all. Singleton's home was in Fredonia, Kan., several miles away from where this business was being conducted. He furnished the capital with which to carry on the business, and the practical management of it was turned over to J. A. Skaggs. That the members of a partnership are bound by the action of one of its members in the employment of servants and employees for the purpose of carrying on the partnership business is well established. ''Each partner in the prosecution of the business has implied power to employ labor or engage services such as are necessary to conduct the ordinary business of joint enterprise.'' 1 Bates, Partn. § 334, and cases cited. The testimony shows that the cattle were purchased originally from Charles Bruner; that at the time of the purchase Skaggs and Henry went to the house of Charles Bruner, and contracted with him for the purchase of the same; that the cattle were left in the pasture of Bruner for some time after they were purchased. And Bruner testified that he did not know Singleton in the transaction; that he told them he would not be responsible, as he was going to be away from home, and Skaggs said he or Henry would be around there to look after the cattle; that the cattle were taken away while he was absent from home; and that Henry afterwards paid him for the pasturage of the cattle. The testimony of a number of other witnesses was offered to show that Skaggs and Henry were buying and selling cattle in the neighborhood, and were generally regarded as partners. The trial court ruled that this testimony was not proper until defendant had first established that Henry was Singleton's agent. We think that the question of whether Henry's relations to the business were such as to constitute him a partner of Skaggs, or an agent of the partnership, should have been submitted to the jury, under proper instructions, and that it was error for the court to direct a verdict for the plaintiff. In Bromley vs Elliot, 75 Am. Dec. 183, it was held ''that a person

who receives a share of business profits by way of salary or compensation for service is liable as a partner to third persons, unless the true character of the agreement is known, or the apparent relations of the parties are such as should put parties dealing with them upon inquiry." If a wrong has been committed in this case, it was occasioned by the appellee, and, if it be claimed for him that he was innocent of the transaction in question he stands upon no higher ground than the appellant; and where one of two innocent parties must suffer, every principle of right and justice would suggest that it should be the one who made the commission of the wrong possible,—the one who placed the power in the hands of the man who actually committed the wrong. "Where one person clothes another with all the indicia of ownership of personal property, he is bound by the act of such person, even though it be contrary to his instructions." Carmichael vs Buck, 70 Am. Dec. 226; Mowrey vs Walsh, 8 Cow. 238; Rosser vs Darden (Ga.) 7 S. E. 919, 14 Am. St. Rep. 152; Steamboat Co. vs Scudder, 67 U. S. 372, 17 L. Ed. 282; Saltus vs Everett, 20 Wend. 267; 2 Herm. Estop. § 978. Mr. Herman, in his work on Estoppel and Res Judicata, in the section above quoted, says: "Where the owner holds out another or allows him to appear as the owner of, or as having full power of disposition over, the property, and innocent third parties are led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party, with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the sale or conveyance. Possession of personal property is prima facie evidence of title. It would furnish fraudulent parties with the means of defrauding

honest purchasers to intrust them with the apparent owner-ship of property, while the real title is allowed to remain in a third party, who can reclaim it at pleasure." We are therefore of opinion that there is error in the record, and that the appellant was entitled to a new trial. The case is therefore reversed, with directions to the court below to set aside the judgment and grant a new trial. Reversed and remanded.

CLAYTON, C. J., and TOWNSEND and GILL, JJ., concur.